UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SOMBO KANNEH,<br><br>Defendant. | CRIMINAL NO. 18-cr-00094 (JDB) |

**GOVERNMENT'S MOTION FOR A DOWNWARD DEPARTURE AND
MEMORANDUM IN AID OF SENTENCING**

The United States of America respectfully moves for a two-level downward departure, pursuant to United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5K1.1, and submits this memorandum in aid of sentencing. Defendant Sombo Kanneh ("Kanneh") served a key role as an administrator and bribe-payor in a scheme that defrauded a Department of Veterans Affairs ("VA") program specifically devoted to helping United States military veterans with service-connected disabilities. The bribes she paid corrupted the process by which the government was supposed to be serving these veterans. When she was caught and confronted by federal law enforcement agents, Kanneh initially lied about her knowledge of the bribery scheme. In a subsequent interview, she confessed to her crimes and thereafter provided substantial assistance to the government's investigation of James King, a corrupt former VA official who ultimately pled guilty to an information charging bribery, honest services wire fraud, and falsification of documents. A sentence of 33 months for Kanneh is sufficient but not greater than necessary to achieve the goals of sentencing set forth in 18 U.S.C. § 3553(a). The government also respectfully requests that the Court order Kanneh to pay $113,227.30 in restitution to the VA, which is the stipulated restitution amount in Kanneh's plea agreement.

## BACKGROUND

On April 16, 2018, Albert Poawui, who was Kanneh's employer and coconspirator and who also reached a plea agreement with the government, pled guilty to a one-count information charging bribery, in violation of 18 U.S.C. § 201(b)(1).  *United States v. Poawui*, No. 1:18-cr-00083-JDB, Dkt. No. 7 (Plea Agreement) (D.D.C. April 16, 2018).  On April 19, 2018, Kanneh, pursuant to a plea agreement, pled guilty to a one-count information charging conspiracy to commit bribery in violation of 18 U.S.C. § 371.  *United States v. Kanneh*, No. 1:18-cr-00094-JDB, Dkt. No. 7 (Plea Agreement) (D.D.C. April 19, 2018).  Kanneh's sentencing hearing is scheduled for February 11, 2018, and Poawui's is scheduled for February 12, 2018.  James King, the VA official who the defendant and Kanneh bribed, is scheduled to be sentenced on February 15, 2018.  *See United States v. King*, 18-cr-00318-JDB, Dkt. No. 1 (Information) (D.D.C. Oct. 22, 2018).

Under the terms of Kanneh's plea agreement, the parties have agreed to the following Guidelines range calculation.

| Category | Points | Guidelines Citation |
|---|---|---|
| Base Offense Level | 12 | U.S.S.G. §2X1.1/C1.1(a)(2) |
| More Than One Bribe | +2 | U.S.S.G. §2C1.1(b) |
| Benefit Received/Loss | +14 | U.S.S.G. §2B1.1(b)(1)(H) |
| Acceptance of Responsibility | -3 | U.S.S.G. §3E1.1(a) & (b) |
| Total Offense Level | **25** | |
| Criminal History Category | I | U.S.S.G. ch. 5 pt. A (Sentencing Table) |
| Final Guidelines Range | 25/I = **57 - 71 months** **Zone D** | U.S.S.G. ch. 5 pt. A (Sentencing Table) |

The plea agreement states that "neither party will seek any offense-level calculation different from" the calculation set forth above. *See* Dkt. No. 7 at 4 (Plea Agreement). However, after Kanneh entered her plea, the government determined that a three-level Mitigating Role reduction is warranted given the circumstances and facts surrounding Kanneh's participation in the criminal scheme. *See* U.S.S.G. § 3B1.2. On January 7, 2018, the undersigned attorneys contacted Kanneh's counsel to inform him that the government would be seeking a two-level downward departure based on Kanneh's cooperation and that it believed a further three-level role reduction was also appropriate. Kanneh's counsel stated no objection to imposing the three-level role reduction. Therefore, the government expects that at sentencing the parties will jointly seek application of the three-point reduction, even though it is not included in the plea agreement. If the Court applies both a two-level reduction for Kanneh's substantial assistance and a three-level reduction for Kanneh's role, the total offense level will be 20, which corresponds to a Guidelines range of 33 to 41 months.

## SUMMARY OF THE CRIMINAL CONDUCT

Kanneh's plea relates to her participation in the corrupt activities of Atius Technology Institute ("Atius"), a Maryland corporation owned and controlled by Poawui. In early 2016, Kanneh began taking courses at Atius as a tuition-paying student. In the summer of 2016, following the completion of her last course, Poawui offered Kanneh an internship at the school. In October 2016, Poawui promoted Kanneh to a full-time position as the company's financial manager, even though she had no previous professional experience in finance or accounting. Kanneh's employment contract provided that she would be paid an annual salary of $40,000. In her role as Atius's financial manager, Kanneh managed Atius's day-to-day finances and was the only person besides Poawui who had access to Atius's bank accounts. She possessed a debit card

for the accounts, made day-to-day spending decisions for the company, and submitted invoices to vendors. Kanneh also had authorization to make large transfers between and withdrawals from Atius's bank accounts. In addition to her role managing Atius's finances, Kanneh supervised Atius's office managers at both Atius locations, in Beltsville, Maryland, and Springfield, Virginia. Kanneh had little if any role in providing education to Atius's students, and aside from one or two perfunctory communications with King[1] she had no substantive role in communicating with the VA about veterans attending Atius.

Poawui created Atius years before Kanneh's involvement began, and by the time Kanneh joined the company, Poawui had already been bribing King and defrauding the VA for over a year. Poawui and King's scheme involved a congressionally-created VA program called the Vocational Rehabilitation and Employment Program ("Voc. Rehab"). *See* 38 U.S.C. 3100, *et seq.* Voc. Rehab provides rehabilitation services to veterans with disabilities they incurred as a result of their military service. *See* 38 U.S.C. § 3102. Particularly relevant to this case is Voc. Rehab's function of paying tuition and related expenses for veterans seeking vocational training or other education in pursuit of better career opportunities. Schools can apply to become approved vendors with Voc. Rehab by submitting paperwork to the VA and demonstrating that they meet certain threshold requirements, such as having a physical location with handicap accessibility. Voc. Rehab program counselors are, in turn, responsible for counseling veterans on which school they can and should attend based on the veterans' individualized needs and interests.

In the late summer of 2015, King became the Voc. Rehab program counselor assigned to Atius, meaning that any Voc. Rehab veteran who attended Atius would be under King's

---

[1] Kanneh dropped off Atius fliers to the VA once and sent an email with student information to King once.

supervision. Poawui and King entered a verbal agreement for Poawui to pay King 7% of the gross payments made by the VA to Atius for the tuition and supplies of all veterans attending Atius from the VA's Washington, D.C., Regional Benefit Office, where King worked. Poawui, for his part, sent, or directed his employee to send, false documents to King indicating that the students were receiving vastly inflated (often 32 weekly hours) quantities of instruction that Atius was incapable of offering. At Poawui's direction, an Atius employee submitted to the VA "Certificates of Completion" for veterans who had not completed the courses listed on the certificates. King ensured that the VA paid Atius regardless of whether the students showed up to class, succeeded in passing the class, or learned anything. Atius's invoices charged exorbitant fees—typically between $20,000 and $60,000 per student—for courses that were supposed to take place over long periods of time; often 12 to 18 months. Both before and after Kanneh joined the conspiracy, Atius was providing substandard education and has been described by multiple veterans as a "sham" school. The instruction was poor or non-existent, students and instructors often lacked proper equipment, and veterans rarely if ever successfully completed the certification exams that were the main objective of the courses.

Close to the time that Kanneh became fully employed by Atius, Poawui explained to her the bribery arrangement with King. Kanneh then took on the role of transferring money between Atius's bank accounts and making cash withdrawals so that Poawui could pay King the 7% fee. Since the VA often made lump sum payments to Atius for multiple students—sometimes amounting to $300,000 or more—the withdrawals for King's bribes were so large that Kanneh had to notify the bank in advance. During her meetings with the prosecution team, Kanneh described in detail the procedure for making the withdrawal, packaging the cash, storing it at Atius, and, at least twice, providing it to King's associate who came to the school to collect the money for King.

Kanneh has admitted that she knew the purpose of each of these withdrawals and payments was to pay King his 7% fee.

During the entire course of Poawui's scheme, the VA paid Atius over $2.2 million for veterans' education.  Kanneh's Statement of Offense stipulates that approximately $1,423,000 of these payments were made after Kanneh joined the conspiracy in or about October 2016.  Less than half of these payments were spent on legitimate business expenses related to Atius; the rest—at least $800,000—were net proceeds from the criminal activity.

In addition to her salary, Kanneh benefitted from the scheme by frequently using Atius's debit cards to buy meals for herself and other Atius employees.  Atius's bank statements also reflect payments for spa treatments that Kanneh admitted were hers.  Kanneh took these benefits with Poawui's permission.  In December 2016, Poawui bought Kanneh a 2014 Range Rover using the money that the VA paid Atius.  In the spring of 2017, Poawui took Kanneh and several other Atius employees on a four-day vacation to Puerto Rico with all expenses paid by Atius.

## ARGUMENT

I. **Motion for Downward Departure Pursuant to Section 5K1.1 of the Guidelines**

On December 12, 2018, Kanneh was interviewed by the government's case agents at Atius's Beltsville office.  During this interview, Kanneh falsely denied her knowledge of any payments from Poawui to King or any financial arrangement between them.  Upon being contacted again by the case agents, Kanneh agreed to a second interview, which took place on December 14, 2017.  During this interview, Kanneh explained the details of the bribery scheme and her role in the payments, but was not clear about when she became aware of Poawui and King's agreement.

On January 29, 2018, Kanneh met with the government for a third time at the U.S. Attorney's Office.  During this several hour meeting, Kanneh admitted that she knew about the

bribery scheme since becoming a full-time employee at Atius. Kanneh was helpful in providing detailed accounts of the way the bribe payments worked, the instructions she received from Poawui, and the complaints by students about Atius and King. Kanneh also provided a narrative for text message communications between her, Poawui, and a third Atius employee. Kanneh subsequently testified before the grand jury to summarize her knowledge of and participation in the scheme.

Based on the foregoing substantial assistance, the government recommends a two-level downward departure pursuant to Section 5K1.1 of the Guidelines.

## II. The Applicable Pre-Departure Advisory Guidelines Range Is 57 to 71 Months

### A. *Legal Principles*

The goal of sentencing is to achieve a sentence that is "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a). In determining the appropriate sentence, a district court must use the correctly calculated Guidelines Range as its "starting point and the initial benchmark." *United States v. Gall*, 552 U.S. 38, 49 (2007). The court must then weigh the factors set forth in Section 3553(a), which include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed . . . medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for—(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .; (5) any pertinent policy statement . . .; [and] (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . .

*Id.* A district court need not, however, "robotically tick through § 3553(a)'s every subsection," nor must it "explicitly discuss every § 3553(a) factor on the record." *United States v. Johnson*,

7

445 F.3d 339, 345 (4th Cir. 2006). "This is particularly the case when the district court imposes a sentence within the applicable Guidelines range." *Id.* Indeed, a "universally applicable" principle to sentencing "is that a sentence within the proper advisory Guidelines range is presumptively reasonable." *Id.* at 341 (quotation marks omitted).

    B.    *The Offense Level Calculation*

As set forth above, the government and Kanneh agree that, prior to any reduction related to a Section 5K1.1 departure, Kanneh's total offense level is 25, with a final Guidelines Range of 57-71 months. The government also recommends that the Court apply a three-point Mitigating Role reduction pursuant to U.S.S.G. § 3B1.2. This reduction is applied when a defendant is neither a "minimal participant" nor a "minor participant," but instead falls somewhere in between. *See* U.S.S.G. § 3B1.2(a) & (b). Kanneh fits neatly into this "in between" category. She was more than a "minimal participant" because she understood the entire scope and structure of the criminal activity, including the bribery and fraud aspects of the scheme; she supervised other employees at Atius; and she performed an essential role at the company that enabled the scheme to continue and proliferate. *See* U.S.S.G. § 3B1.2 application notes 3(C)(i), (ii), and (iv); 4. However, the two-level reduction accompanying a "minor participant" designation insufficiently accounts for the limitations attached to Kanneh's role. *See* U.S.S.G. § 3B1.2 application note 5. Kanneh entered the conspiracy after it began, did not have decision-making authority or discretion concerning the details of the bribery arrangement, and stood to benefit less than King or Poawui. *See* U.S.S.G. § 3B1.2 application notes 3(C)(ii), (iii), and (v); 5.

Accordingly, after factoring in offense level reductions for Kanneh's substantial assistance under U.S.S.G. § 5K1.1 and her role under U.S.S.G. § 3B1.2, Kanneh's offense level is 20.

## III. The Section 3553(a) Factors

### A. Nature and Circumstances of the Offense

Kanneh's crime is a serious one that involved not only financial but also deeply personal repercussions. Kanneh was keenly aware of both types of harm, and she knew that Atius was a sham. As the financial manager of Atius, she repeatedly facilitated bribes, and her hands were literally all over the payments that made the scheme work. During her meetings with the prosecution team, Kanneh also admitted her knowledge of complaints by veterans about Atius instructors, the overall quality of instruction at Atius, veterans' inability to get in touch with King, and the lack of proper equipment. None of this deterred Kanneh from continuing to operate and benefit from Atius.

In her meetings with the prosecution team, Kanneh further admitted that she knew Atius students were dropping out of class and that Atius was not providing refunds to the VA. Over the lifespan of the scheme, she had numerous conversations with Poawui about the payments to King, and she understood the central role their corrupt agreement played in the continuation of Atius's business. Although Kanneh was not centrally involved in the education side of the business, she understood that Poawui's misrepresentations to the VA were a key engine behind the payments. Kanneh also admitted to the prosecution team that she knew Poawui was sending the VA inaccurate information about the veterans' class hours. Finally, she admitted that the purpose of doing so was to ensure the veterans received a "full-time" designation so they could receive a subsistence allowance and thus would agree to enroll at Atius.

The conspiracy was not Kanneh's idea and she was not its leader. But her involvement in the scheme was critical to its perpetuation and proliferation, and her administrative management of Atius allowed Poawui to pay little attention to the company while it continued to defraud the

VA and harm disabled veterans. During Kanneh's participation in the conspiracy, over forty veterans were enrolled at Atius and the VA paid out $1.4 million to a sham school. Kanneh's sentence should reflect the fact that Poawui and King would not have accomplished such prolific, long-lasting, and harmful corruption without the knowing and willing cooperation of a coconspirator such as Kanneh.

Kanneh's salary from Atius does not fully reflect the personal benefits she obtained from the scheme. During her employment at Atius, Poawui promised Kanneh that she could set up a second business, called "Suita" (Atius spelled backwards), that would provide healthcare services. Poawui and Kanneh created a bank account for Suita, which ended up serving as a backup piggybank for Atius. Suita never launched, but as recently as Kanneh's interview with the prosecution team in January 2018, she was still planning to start Suita with Poawui.

Finally, as the person who monitored Atius's bank accounts and managed its day-to-day finances, the relationship between Atius's payments from the VA and the benefits Kanneh received could not have been lost on her. For example, between March and May 2017, which included the time period of the Puerto Rico vacation, the VA paid Atius over $460,000. The month before Poawui bought Kanneh the Range Rover, the VA paid Atius over $24,000. A month after, the VA made four payments to Atius amounting to over $380,000.

  B.  *History and Characteristics of the Defendant*

Kanneh has no significant criminal record and there is no known information about her background to indicate that she was likely to commit crimes prior to meeting Poawui. Kanneh is a well-educated individual who apparently had good intentions when she first became involved with Atius. But her decision to become a key part of the corrupt conspiracy in this matter was not a fleeting mistake or poor exercise of judgment. Rather, she made a calculated decision to enter

the conspiracy to benefit herself at the expense of disabled veterans. Kanneh participated in the conspiracy for nearly a year and a half before she was caught. And, when she was first confronted by the FBI and Department of Veterans Affairs Office of Inspector General agents, she lied, thereby committing a separate crime that the government did not charge as part of Kanneh's plea deal.

Even after Atius stopped receiving payments from the VA, Kanneh harbored hope of continuing to do business with Poawui, a known criminal and the mastermind of a corrupt scheme. Kanneh could have left Atius at any time and ceased her role in harming disabled veterans. She knew that she was helping Poawui become rich on the back of a corrupt, secret deal, and she knew she was depriving deserving veterans of a proper and well-deserved education in the process. But she stayed at Atius and helped the scheme proliferate. Her sentence should adequately reflect both the seriousness of her crimes and the duration of her involvement in the overall conspiracy.

      C.     *Providing Adequate Deterrence of Criminal Conduct*

James King has pled guilty to being bribed by at least two other owners of sham schools. What makes Atius unique among the three schools that bribed King is the extent of the criminal activity, measured by both the number of veterans affected and the overall financial loss to the VA. In order to commit such a significant offense for so long, Poawui needed a right-hand person who knew about the corrupt scheme and could advance it. Kanneh filled that role willingly and ably. Kanneh's sentence should reflect the need to deter others from aiding the type of corruption that occurred in this case.

      D.     *The Need to Provide Restitution to Any Victims of the Offense*

The plea agreement stipulates that Kanneh will pay $113,227.30 in restitution to the VA. This amount is calculated by adding a conservative estimate of (1) Kanneh's personal, direct

financial benefit from her participation in the conspiracy ($60,000) to (2) half the bribes paid to King during Kanneh's participation in the scheme ($53,228.30).

## CONCLUSION

For the foregoing reasons, the government respectfully moves this Court for a two-level downward departure under Section 5K1.1 of the Guidelines based on Kanneh's substantial assistance, and recommends a sentence of 33 months' incarceration with a three-year period of supervised release and $113,227.30 in restitution payable to the VA.

Respectfully submitted,

ANNALOU TIROL
Acting Chief
Public Integrity Section
Cal. Bar No. 216578

By: *[signature]*
SIMON J. CATALDO, Mass. Bar. No. 690879
Trial Attorney
1400 New York Ave. NW
Washington, D.C. 20005
(202) 616-2464


JESSIE K. LIU
United States Attorney
District of Columbia
D.C. Bar No. 472845

By: /s/
DAVID MISLER, D.C. Bar. No. 991475
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7164
David.Misler@usdoj.gov